920 A.2d 88

NEW JERSEY TURNPIKE AUTHORITY, PLAINTIFF-RESPONDENT, v. LOCAL 196, I.F.P.T.E., DEFENDANT-APPELLANT.

Argued March 5, 2007—Decided April 23, 2007.

*Leonard C. Schiro,* argued the cause for appellant (*Mets & Schiro,* attorneys).

*Angelo J. Genova,* argued the cause for respondent (*Genova, Burns & Vernoia,* attorneys; *Brian W. Kronick,* of counsel; *Timothy Averell,* on the briefs).

Chief Justice ZAZZALI delivered the opinion of the Court.

On his way home from work, a toll collector employed by the New Jersey Turnpike Authority (Authority) fired a paintball gun at a slower moving vehicle. That misconduct led to the employee's termination. Nearly one year later, pursuant to a collective bargaining agreement, a mutually-selected arbitrator heard the employee's grievance. The arbitrator reinstated the employee to his former position, but imposed an eleven-month, unpaid suspension and required periodic psychological evaluations. The Chancery Division upheld the arbitral decision, but the Appellate Division vacated the award, finding that the arbitrator failed to appropriately consider public policy.

In this appeal, we must determine whether a public-sector arbitration award reinstating an Authority employee violated public policy and therefore should be vacated. We hold that a court may vacate an arbitration award in a labor dispute on public policy

grounds when the award, rather than the conduct giving rise to the dispute, violates public policy embodied in statute, regulation, or legal precedent. Here, we conclude that the present award—the remedial action ordered by the arbitrator—did not contravene a clear mandate of public policy. That result fosters the expectation of finality in labor arbitration, improves the stability of employee-employer relations, and reaffirms New Jersey's long-standing tradition of deference to arbitration awards.

## I.

Jason Glassey is a toll collector employed in the Authority's Garden State Parkway (Parkway) Division. One day, Glassey departed from work following his morning shift "[f]eeling a lot of stress" and "a little annoyed." En route home and still in uniform, Glassey was mired in the left lane of the Parkway behind a slow-moving, white van. In Glassey's own words, the following transpired:

> I came up behind a line of [two] cars behind a white work van that was driving in the left lane and pacing the car in the right lane next to him. After[ ] a couple minutes the other [two] cars in front of me finally sneaked around the white van and passed him on the right. The previous Monday I had been playing paintball with my friends, and I still had my paintball marker gun in my truck. As I saw a chance to pass the white van I began to pass him on the right. In a moment of anger, and extreme stupidity, I grabbed the paintball gun and fired several shots at the passenger window.

Glassey shot at least four balls of blue paint at the van, striking the vehicle's front windshield and passenger-side window and paneling. Jorge Morales, the driver of the van, observed Glassey laughing as he sped by. Although Morales was not injured and did not suffer significant property damage, he nonetheless pursued Glassey, hoping to notify the authorities of Glassey's license plate number. When Morales spotted a New Jersey State Trooper, he flagged down the officer and reported the incident. Minutes later, the Trooper stopped Glassey as he exited the Parkway. Glassey readily admitted that he shot paintballs at Morales' vehicle. "[I]t was stupid," he said. "The guy pissed me off because he would not move [to the right]."

Glassey was charged with possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(d), and interference with transportation, *N.J.S.A.* 2C:33–14(a)(1). In his statement to police, Glassey admitted to the shooting and apologized for his conduct: "I feel so stupid and sorry for what I did[ ] and promise never to do anything like this again." Glassey further explained that, at the time of the incident, he was medicated due to his depression. He later identified anxiety concerning his then-upcoming nuptials as a cause of the inordinate stress he experienced on the day in question.

In response to Glassey's misconduct, the Authority suspended him without pay and charged him with violating Item 31 of the "General Rules and Regulations" contained in the Toll Collector's Manual, which provides that "[e]mployees must not commit any act which will be prejudicial to the good order or discipline of this Authority." Pursuant to the collective bargaining agreement between the Authority and Local 196, International Federation of Professional and Technical Engineers, AFL/CIO (Local 196), a disciplinary hearing was held before the Director of Toll Collection. Although Glassey invoked his Fifth Amendment right against self-incrimination, the Director terminated Glassey's employment with the Authority based on the testimony of an area manager. The Director opined: "By your act of aggression, you have demonstrated a flagrant disregard for the personal property and safety of Garden State Parkway customers. Your actions are unacceptable . . . and will not be tolerated."

Following his discharge, Glassey pled guilty to the disorderly persons offense of interference with transportation. The trial court sentenced Glassey to two years probation, conditioned on his continued psychiatric counseling. The court determined that *N.J.S.A.* 2C:51–2(a)(2), which requires forfeiture of public office on conviction of an offense that involves or touches one's position or employment, was not implicated. The county prosecutor agreed with the trial court's decision not to require job forfeiture.

Thereafter, Local 196 filed a grievance contesting the Director's decision and, in accordance with the collective bargaining agreement, sought binding arbitration before a mutually-selected arbitrator (Arbitrator). In addition to relying on the court's finding that Glassey did not forfeit his position as a toll collector, Glassey argued that termination was inappropriate because his conduct did not harm the Authority's reputation, his actions did not render him unable to perform his duties, co-workers remained willing to work with him, and no substantial nexus existed between his conduct and his employment as a toll collector. In contrast, the Authority asserted that Glassey's termination was justified because "[Glassey's] actions implicate safety concerns and bring the reputation of the Authority into disrepute."

After "carefully weigh[ing] all of the evidence," the Arbitrator declared that "Glassey was not terminated for just cause." In view of "the competing equities . . . [and] the nature of what occurred in the context of [Glassey's] mental state," the Arbitrator ordered Glassey's reinstatement. However, because the Arbitrator could not "condone [Glassey's] actions," he concluded that Glassey was not entitled to back pay. The Arbitrator held that the eleven-month period between Glassey's termination and the award was a "disciplinary suspension." Additionally, as a condition of his return, the Arbitrator required Glassey to undergo physical and psychological evaluations, specifically a psychological fitness examination prior to reinstatement and regular mental health monitoring during his employment.

The Authority filed a complaint in the Chancery Division seeking vacation of the award, maintaining that "the Arbitrator failed to give appropriate weight to Mr. Glassey's actions in light of accepted public policy." The court upheld the award, finding that it contained language "that certainly convinces this [c]ourt" that the Arbitrator considered all arguments—including public policy arguments—asserted by the parties. According to the court, "the award [did] not violate" the State's public policy nor did Glassey's conduct "directly implicate" the public's interest in roadway safe-

ty. The court remarked that an alternative result would mean that "virtually any conduct that poses [a] safety risk to other drivers[,] such as drunk driving and reckless or careless driving[,] would invoke public policy and thereby open[ ] an avenue for the vacation of arbitration awards."

The Appellate Division disagreed. In an unpublished, per curiam opinion, the panel stated that "nothing in the Arbitrator's decision ... indicates consideration of public policy." The panel reversed the Arbitrator's award and reinstated the termination sanction because the Arbitrator failed "to give due consideration to a clear mandate of public policy." This Court granted certification. 188 *N.J.* 490, 909 *A.*2d 725 (2006).

In resolving this dispute, we first discuss the policy justifications favoring arbitration of labor disputes and the applicable standard of review. We then address whether the present appeal implicates a "clear mandate of public policy." In doing so, we define that term and provide a framework for review of the present and future arbitration awards that are contested on public policy grounds. Next, we review the award before us, affording appropriate deference to the judgment of the mutually-selected arbitrator.

## II.

[2] For the guidance of trial and appellate courts in future labor arbitration disputes, we iterate, yet again, the fundamental principle that New Jersey law encourages the use of arbitration to resolve labor-management disputes. *See, e.g., N.J.S.A.* 34:13A–2 (declaring State's "best interests ... are served by the prevention or prompt settlement of labor disputes" in public sector); *Scotch Plains–Fanwood Bd. of Educ. v. Scotch Plains–Fanwood Educ. Ass'n,* 139 *N.J.* 141, 149, 651 *A.*2d 1018 (1995) ("Our courts view favorably the settlement of labor-management disputes through arbitration."). Arbitration is "an integral part of our economic life and welcomed as a practical and expeditious means of disposition of industrial disputes." *Jersey Cent. Power & Light Co. v. Local*

*Union No. 1289 of the Int'l Bhd. of Elec. Workers,* 38 *N.J.* 95, 103–04, 183 *A.*2d 41 (1962) (quotation omitted). Moreover, arbitration is "meant to be a substitute for and not a springboard for litigation." *Local No. 153, Office & Prof'l Employees Int'l Union v. The Trust Co. of N.J.,* 105 *N.J.* 442, 449, 522 *A.*2d 992 (1987) (quotation omitted). Arbitration should spell litigation's conclusion, rather than its beginning. *County Coll. of Morris Staff Ass'n v. County Coll. of Morris,* 100 *N.J.* 383, 390, 495 *A.*2d 865 (1985).

 To ensure that finality, as well as to secure arbitration's "speedy[ ] and inexpensive" nature, *Scotch Plains–Fanwood Bd. of Educ., supra,* 139 *N.J.* at 149, 651 *A.*2d 1018 (quotation omitted), there exists a "strong preference for judicial confirmation of arbitration awards," *Weiss v. Carpenter, Bennett & Morrissey,* 143 *N.J.* 420, 442, 672 *A.*2d 1132 (1996). Indeed, "the role of the courts in reviewing arbitration awards is extremely limited and an arbitrator's award is not to be set aside lightly." *State, Dept. of Corrections v. Int'l Fed'n of Prof'l & Technical Eng'rs, Local 195,* 169 *N.J.* 505, 513, 780 *A.*2d 525 (2001) (citation omitted). Thus, in public sector arbitration, courts will accept an arbitrator's award so long as the award is "reasonably debatable." *See, e.g., Bd. of Educ. of Alpha v. Alpha Educ. Ass'n,* 188 *N.J.* 595, 603, 911 *A.*2d 903 (2006) (quotation omitted). In brief, statutory and decisional law make clear that policy considerations favor finality and circumscribed judicial involvement in respect of arbitration proceedings.

 The substantial deference our courts provide arbitral decisions corresponds with federal jurisprudence, which this Court has repeatedly consulted for guidance, *see, e.g., Int'l Fed'n of Prof'l & Technical Eng'rs, supra,* 169 *N.J.* at 513–14, 780 *A.*2d 525. Nearly a half-century ago, the United States Supreme Court, in the "Steelworkers Trilogy," [1] established two time-hon-

---

[1] *United Steelworkers of Am. v. Am. Mfg. Co.,* 363 *U.S.* 564, 80 *S.Ct.* 1343, 4 *L.Ed.*2d 1403 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation*

ored principles—that policy favors efficient settlement of labor disputes through arbitration and that judicial involvement in such disputes should be limited. Well-settled rules therefore command that a "court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one. When the parties include an arbitration clause in their collective-bargaining agreement, they choose to have disputes ... resolved by an arbitrator." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 *U.S.* 757, 764, 103 *S.Ct.* 2177, 2182, 76 *L.Ed.*2d 298, 306 (1983) (internal citation omitted).

Legislation underscores the limited judicial review of arbitration awards. The New Jersey Arbitration Act, *N.J.S.A.* 2A:24–1 to – 11, which applies to arbitration and disputes "arising from a collective bargaining agreement," *N.J.S.A.* 2A:24–1.1, permits courts to vacate an arbitration award, but only in the following circumstances:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

[*N.J.S.A.* 2A:24–8.]

 Additionally, the Supreme Court articulated a public policy exception in *W.R. Grace & Co., supra*, holding that courts may not enforce collective bargaining agreements that are contrary to "well defined and dominant" public policy. 461 *U.S.* at 766, 103 *S.Ct.* at 2183, 76 *L.Ed.*2d at 307. This Court also has

Co., 363 *U.S.* 574, 80 *S.Ct.* 1347, 4 *L.Ed.*2d 1409 (1960); *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 *U.S.* 593, 80 *S.Ct.* 1358, 4 *L.Ed.*2d 1424 (1960).

recognized a public policy exception, observing that a court "may vacate an award if it is contrary to existing law or public policy." *Bd. of Educ. of Alpha, supra,* 188 *N.J.* at 603, 911 *A.*2d 903 (quotation omitted). Our public policy exception requires "heightened judicial scrutiny" when an arbitration award implicates "a clear mandate of public policy," *Weiss, supra,* 143 *N.J.* at 443, 672 *A.*2d 1132. A court may vacate such an award provided that the "resolution of the public-policy question" plainly violates a clear mandate of public policy. *Ibid.* Reflecting the narrowness of the public policy exception, that standard for vacation will be met only in *"rare circumstances." Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.,* 135 *N.J.* 349, 364, 640 *A.*2d 788 (1994) (emphasis added).

### III.

#### A.

Our first step in determining whether the public policy exception applies—i.e., whether the award violates a "clear mandate of public policy"—is to define "public policy." In *Weiss, supra,* we observed that "public-policy principles" are established by government "in statute, regulation, or otherwise for the protection of the public." 143 *N.J.* at 443, 672 *A.*2d 1132. Analogously, in discussing "well defined and dominant" public policy, the United States Supreme Court pronounced that such policy "is to be ascertained by reference to the laws and legal precedents and *not from general considerations of supposed public interests." W.R. Grace & Co., supra,* 461 *U.S.* at 766, 103 *S.Ct.* at 2183, 76 *L.Ed.*2d at 307 (quotation omitted) (emphasis added). That assertion has been followed by countless federal courts and adopted by numerous jurisdictions. *See, e.g., Weber Aircraft Inc. v. Gen. Warehousemen & Helpers Union Local 767,* 253 *F.*3d 821, 826 (5th Cir.2001); *Van Waters & Rogers, Inc. v. Int'l Bhd. of Teamsters, Local Union 70,* 913 *F.*2d 736, 742 (9th Cir.1990); *Sw. Ohio Reg'l Transit Auth. v. Amalgamated Transit Union, Local 627,* 91 *Ohio St.*3d 108, 742 *N.E.*2d 630, 634–35 (2001).

■ In light of our jurisprudence and the similar holdings of other courts in the labor arbitration context, we conclude that, for purposes of judicial review of labor arbitration awards, public policy sufficient to vacate an award must be embodied in legislative enactments, administrative regulations, or legal precedents, rather than based on amorphous considerations of the common weal.

## B.

In view of that definition, we now consider how a "clear mandate of public policy" may be implicated in the labor arbitration context. More specifically, we examine whether the public policy exception is triggered by the arbitral award, that is, the ultimate resolution and remedy, or the grievant's underlying transgression.

The present controversy provides context for this analysis. The Authority, viewing the public policy exception broadly, contends that Glassey's *conduct*—his admitted use of a paintball gun— violated a clear public policy against aggressive driving embodied in *N.J.S.A.* 2C:33–14(a)(1). Conversely, Local 196 advances a narrow view of the public policy exception, maintaining that although Glassey's conduct violated public policy, the arbitration *award*—Glassey's reinstatement after eleven months without back pay—did not violate any public policy mandate.

In New Jersey's seminal public policy exception case, *Weiss, supra*, an arbitrator upheld a contractual provision that barred partners withdrawing from a law firm from collecting their equity interests absent death, permanent disability, judicial appointment, or attainment of age sixty-five. 143 *N.J.* at 422, 672 *A.2d* 1132. However, the Court vacated the arbitrator's award, holding that the arbitrator's decision violated public policy as expressed in our *Rules of Professional Conduct. Id.* at 447–48, 672 *A.2d* 1132. Delineating the applicable standard of review, the Court declared that "if the arbitrator's *resolution* of the public-policy question is not reasonably debatable[, then] . . . a court must intervene to prevent enforcement of the award." *Id.* at 443, 672 *A.2d* 1132

(emphasis added). Indeed, that intervention on public policy grounds is to "verify that the interests and objectives to be served by the public policy are not frustrated and thwarted by the *arbitral award." Ibid.* (emphasis added). The Court's narrow analytical focus was on the resolution—the arbitrator's award— and not the conduct or contractual provision prompting the arbitration.

United States Supreme Court precedent, which provides guidance to our State courts in the area of labor relations, *see Troy v. Rutgers,* 168 *N.J.* 354, 373 n. 3, 774 *A.*2d 476 (2001), prescribes a similar result. For example, in upholding an arbitrator's interpretation of a collective bargaining agreement, the Court stated that "*enforcement* of the collective-bargaining agreement as interpreted by [the arbitrator] does not compromise ... public policy." *W.R. Grace & Co., supra,* 461 *U.S.* at 767, 103 *S.Ct.* at 2184, 76 *L.Ed.*2d at 307 (emphasis added). Four years later, the Supreme Court noted that its analysis in *W.R. Grace & Co.* "turned on ... whether the *award* created any explicit conflict with" public policy. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 *U.S.* 29, 43, 108 *S.Ct.* 364, 373, 98 *L.Ed.*2d 286, 302 (1987) (emphasis added) (noting limitations on courts' authority to overturn "an arbitrator's *interpretation*" of collective bargaining agreement). Further, according to *Misco, W.R. Grace & Co.* did not "sanction a broad judicial power to set aside arbitration awards as against public policy." *Ibid.* Thus, the Court's focus was the end result—the arbitrator's award.

In addition to analyzing Supreme Court precedent, *Misco* applied the public policy exception to an arbitral award that resolved a disciplinary matter. There, police witnessed the operator of dangerous equipment smoking marijuana during work hours and discovered a substantial amount of marijuana in his possession. *Id.* at 32–33, 108 *S.Ct.* at 368, 98 *L.Ed.*2d at 295–96. The employee was terminated, but the arbitrator ordered his reinstatement. *Id.* at 33–34, 108 *S.Ct.* at 368, 98 *L.Ed.*2d at 296. In upholding the award, the Court stated that the employee's possession and use of

narcotics in the workplace was "an insufficient basis for holding that his *reinstatement* would actually violate the public policy" against the operation of machinery by intoxicated individuals. *Id.* at 44, 108 *S.Ct.* at 374, 98 *L.Ed.*2d at 303 (emphasis added). Both *Misco's* language and result emphasize judicial concentration on the arbitral award, not the conduct that occasioned the dispute.[2]

Most recently, in *Eastern Associated Coal Corp. v. United Mine Workers of America,* a truck driver twice tested positive for marijuana. 531 *U.S.* 57, 60, 121 *S.Ct.* 462, 465–66, 148 *L.Ed.*2d 354, 363 (2000). After both positive tests, the employee was terminated and later reinstated subject to conditions imposed by an arbitrator. *Id.* at 60–61, 121 *S.Ct.* at 466–67, 148 *L.Ed.*2d at 359–60. For the Supreme Court, "the question to be answered [was] not whether [the employee's] drug use violate[d] public policy, but whether the [award] reinstate[ing] him [did] so." *Id.* at 62–63, 121 *S.Ct.* at 467, 148 *L.Ed.*2d at 361. Notwithstanding the "policies against drug use by employees in safety-sensitive trans- portation positions and in favor of drug testing," the Supreme Court upheld the award. The Court stated:

> The *award* before us is not contrary to these several policies, taken together. The *award* does not condone [the employee's] conduct or ignore the risk to public safety that drug use by truck drivers may pose. Rather, the *award* punishes [the employee] by suspending him for three months, thereby depriving him of nearly $9,000 in lost wages [and imposing other conditions].
>
> *The award violates no specific provision of any law or regulation.*
>
> [*Id.* at 65–66, 121 *S.Ct.* at 468–69, 148 *L.Ed.*2d at 363 (emphasis added).]

---

2 Concurring, Justice Blackmun stated that the Supreme Court failed to address the question certified: "whether a court may refuse to enforce an arbitration award ... on public policy grounds only when the award itself violates positive law." *Misco, supra,* 484 *U.S.* at 46, 108 *S.Ct.* at 375, 98 *L.Ed.*2d at 304 (Blackmun, J., concurring). That comment, however, addressed the Court's declination to address whether the exception applies "only when the award itself violates ... positive law," *id.* at 45 n. 12, 108 *S.Ct.* at 374, 98 *L.Ed.*2d at 304, and not the question we today address. Indeed, the concurrence observed that "[t]he *reinstatement* of [the employee] would not contravene the alleged public policy ...," *id.* at 47, 108 *S.Ct.* at 375, 98 *L.Ed.*2d at 304 (Blackmun, J., concurring), further accentuating the Court's emphasis on the award as the trigger of the public policy exception.

In fact, in adopting the district court's articulation of the public policy exception, the Court expressly agreed that the proper question was whether the "*award*," not the underlying conduct, " 'violate[d]' positive law." *Id.* at 63, 121 *S.Ct.* at 467, 148 *L.Ed.*2d at 361 (emphasis added).[3]

The Supreme Court declared in *Eastern Associated Coal Corp.* that "the public policy exception is narrow and must satisfy the principles set forth in *W.R. Grace* and *Misco*." · *Ibid.* The arbitration award—not the grievant's use of a controlled dangerous substance—was the Court's focal point in *Eastern Associated Coal Corp.*, as it was in *W.R. Grace & Co.* and *Misco.* Those opinions do not expressly answer the question we here address, but their rationales, their language, and their conclusions all support a narrow view of the public policy exception.

A leading treatise on labor arbitration supports that approach. In determining whether arbitration implicated public policy, "[t]he proper test ... is not whether the employee activity in such cases is at odds with public policy, but whether the *reinstatement* is offensive to public policy." Frank Elkouri & Edna A. Elkouri, *How Arbitration Works* 493 (Alan Miles Ruben ed., 6th ed. 2003). The narrow view of the public policy exception has garnered significant support among other commentators and jurists. *See* Theodore J. St. Antoine, *The Changing Role of Labor Arbitration,* 76 *Ind. L.J.* 83, 95, 97 (2001) (arguing that "the key is whether the remedial action ordered by the arbitrator, not the triggering conduct of the employee, is contrary to public policy" and noting scholarly support of narrow view of public policy

---

[3] The majority stated that "in principle ... the public policy exception is not limited solely to instances where the arbitration award itself violates positive law," *E. Associated Coal Corp., supra,* 531 *U.S.* at 63, 121 *S.Ct.* at 467, 148 *L.Ed.*2d at 361. That dictum was concerned with whether public policy may be embodied in common law, not the question we today consider—whether the public policy exception is triggered by the arbitral award or the underlying conduct. *See id.* at 67, 121 *S.Ct.* at 469–70, 148 *L.Ed.*2d at 364 (Scalia, J., concurring) (declining to endorse majority's reference to common law as embodying public policy).

exception); Frank H. Easterbrook, *Arbitration, Contract, and Public Policy, in Arbitration 1991: The Changing Face of Arbitration in Theory and Practice* 65, 70–71 (Gladys W. Gruenberg ed., 1992) (advancing narrow interpretation of public policy exception).

Nevertheless, some courts have opted to focus on the underlying conduct, rather than the award itself. *See* Ann C. Hodges, *Judicial Review of Arbitration Awards on Public Policy Grounds: Lessons from the Case Law,* 16 *Ohio St. J. on Disp. Resol.* 91, 100–15 (2000) (collecting cases); *see, e.g., Bd. of Educ. of Hartford v. Local 566,* 43 *Conn.App.* 499, 683 *A.*2d 1036 (1996) (applying broad public policy exception and vacating employee reinstatement because grievant's embezzlement violated public policy against theft and fraud), *appeal denied,* 239 *Conn.* 957, 688 *A.*2d 327 (1997). However, adoption of that broad view of the public policy exception poses a risk to the finality of arbitration awards and jeopardizes the stability of labor relations. *See Westvaco Corp. v. United Paperworkers Int'l Union,* 171 *F.*3d 971, 977–78 (4th Cir.1999) (observing that broad public policy exception erodes collective bargaining and arbitration). Additionally, the broad view may open the floodgates to substantial litigation in our courts whenever a party seeks to set aside an award by invocation of the public interest, for the reality is that numerous public sector awards—and private sector awards as well—often touch the public interest, either directly or indirectly. Courts must not allow the invocation of a convenient talisman—"public policy"—unless circumstances demand it. Otherwise, public policy becomes an excuse to set aside an award, "a facile method of substituting judicial for arbitral judgment." *Amalgamated Transit Union AFL-CIO Local Div. v. Aztec Bus Lines,* 654 *F.*2d 642, 644 (9th Cir.1981) (quotation omitted).

 We therefore reject the broad view of the public policy exception and reiterate our pronouncement in *Weiss,* the corresponding indications of *W.R. Grace & Co.* and its Supreme Court progeny, and the conclusions of commentators. We hold that the

public policy exception and *Weiss's* heightened judicial scrutiny of awards are triggered when a labor arbitration award—not the grievant's conduct—violates a clear mandate of public policy. If reinstatement of an employee does not violate public policy that is embodied in statute, regulation, or legal precedent, then an award requiring reinstatement does not contravene public policy. The approach we adopt today "is the standard which best effectuates labor policy in both the private and public sectors." Hodges, *supra,* 16 *Ohio St. J. on Disp. Resol.* at 102.

### C.

In the present dispute, the Appellate Division declared that "[t]he public policy against shooting or hurling objects at a moving vehicle could not be clearer." Although the panel correctly looked to statutory law for declarations of public policy, it should have concentrated on the Arbitrator's award rather than on Glassey's conduct.

To be sure, the State has a public policy against aggressive driving, embodied in *N.J.S.A.* 2C:33–14(a)(1), which criminalizes interference with transportation. Although Glassey's conduct violated that public policy, his reinstatement to his position as a Parkway toll collector is not contrary to any embodiment of public policy. More specifically, his reinstatement does not conflict with *N.J.S.A.* 2C:51–2, which governs the forfeiture of public office following a specified conviction. As noted, when Glassey pled guilty to a disorderly persons offense, the trial court concluded that Glassey's conduct did not implicate the forfeiture of public office statute. The county prosecutor agreed with that determination. Therefore, we find that the award reinstating Glassey to his position as a toll collector did not implicate any statutory, regulatory, or precedential embodiment of public policy. Our finding, however, does not suggest that reinstatement of an employee who engaged in misconduct can never be found violative of public policy.

## IV.

■ That conclusion does not end our inquiry. Rather, we must review the present award in accordance with our standard of review, which mandates that a court may not substitute its judgment for that of a labor arbitrator and must uphold an arbitral decision so long as the award is "reasonably debatable." *See, e.g., Bd. of Educ. of Alpha, supra,* 188 *N.J.* at 603, 911 *A.*2d 903.

To begin, termination is a substantial economic penalty. An eleven-month suspension is also a significant sanction, but in appropriate circumstances it may be a more compassionate one. Indeed, in the labor arbitration context, "recognizing the possibility of rehabilitation of wrongdoers is a hallmark of a humane and caring society." St. Antoine, *supra,* 76 *Ind. L.J.* at 97. Legislative enactments encouraging rehabilitation of convicted offenders underscore the appropriateness of a lengthy suspension, rather than termination, in the present appeal. Specifically, the Legislature has declared that the public interest is advanced "by removing impediments and restrictions upon [convicted offenders'] ability to obtain employment." *N.J.S.A.* 2A:168A–1. As the United States Court of Appeals for the Second Circuit aptly noted, "there can hardly be a public policy that a man who has been convicted, fined, and subjected to serious disciplinary measures, can never be ordered reinstated to his former employment." *Local 453, Int'l Union of Elect., Radio & Mach. Workers v. Otis Elevator Co.,* 314 *F.*2d 25, 29 (2d Cir.), *cert. denied,* 373 *U.S.* 949, 83 *S.Ct.* 1680, 10 *L.Ed.*2d 705 (1963).

Moreover, the award reinstating Glassey "without any back pay entitlement" imposed an eleven-month, unpaid suspension. That suspension deprived Glassey of nearly a year's salary, significantly more than the suspension upheld in *Eastern Associated Coal Corp., supra,* 531 *U.S.* at 65, 121 *S.Ct.* at 468, 148 *L.Ed.*2d at 363 (noting grievant's loss of approximately $9,000 in lost wages due to three-month unpaid suspension); *see also Boston Med. Ctr. v. Serv. Employees Int'l Union, Local 285,* 260 *F.*3d 16, 21 (1st Cir.2001) (refusing to terminate employee and upholding nine-

month suspension without pay), *cert. denied,* 534 *U.S.* 1083, 122 *S.Ct.* 816, 151 *L.Ed.*2d 700 (2002); *Local 453, Int'l Union of Elect., Radio & Mach. Workers, supra,* 314 *F.*2d at 26.

Further, in addition to the unpaid suspension, the Arbitrator imposed return-to-work conditions. *See Teamsters Local Union 58 v. BOC Gases,* 249 *F.*3d 1089, 1092 (9th Cir.2001) (affirming arbitrator's award reinstating employee, in part because of requirement that employee pass "a mental and physical examination" to determine fitness to perform duties). The award required Glassey to undergo physical and psychological fitness examinations prior to returning to work and to submit to regular mental fitness examinations after resuming his duties as a toll collector. Combined with the nearly one-year suspension without pay, this award was not the proverbial "slap on the wrist." It was a considerable penalty that recognized economic realities and social norms.

Additionally, deference to an arbitrator's award reinstating an employee to his former position following admittedly serious misconduct is consistent with arbitration jurisprudence across the nation. *See, e.g., Boston Med. Ctr., supra,* 260 *F.*3d 16 (ordering reinstatement of nurse charged with substandard conduct following infant's death); *Westvaco Corp., supra,* 171 *F.*3d 971 (upholding award reinstating employee who sexually harassed coworker); *Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199,* 116 *F.*3d 41 (2d Cir.1997) (upholding reinstatement of employee who assaulted co-worker and was found in possession of less than ounce of marijuana); *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms,* 74 *F.*3d 169 (9th Cir.1995) (ordering reinstatement of employees who failed drug test); *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of Am.,* 959 *F.*2d 685 (7th Cir.) (reinstating employee who sexually harassed colleague), *cert. denied,* 506 *U.S.* 908, 113 *S.Ct.* 304, 121 *L.Ed.*2d 227 (1992); *Local 453, Int'l Union of Elec., Radio & Mach. Workers, supra,* 314 *F.*2d 25 (upholding reinstatement of employee convicted of gambling in workplace). Specifical-

ly, deference to a reinstatement award comports with the comparable result in *United States Postal Service v. National Ass'n of Letter Carriers*, 839 *F*.2d 146 (3d Cir.1988). There, a postal employee confessed to firing "gun shots at his [p]ostmaster's empty parked car, damaging the windshield, dashboard and front seat." *Id.* at 147. And there, as here, the employee was discharged for his off-duty conduct and the arbitrator reinstated the grievant. *Ibid.* Although the United States Court of Appeals for the Third Circuit declined to address the breadth of the public policy exception, *id.* at 150, Chief Judge Gibbons, writing for the court, remanded the matter for entry of an order enforcing the arbitrator's award, *id.* at 150–51.

We do not, however, understate the imprudence of Glassey's conduct. As the decisional law reveals, courts will vacate arbitral awards reinstating terminated employees, but generally reserve such intervention for factual circumstances more serious than those presented here. *See, e.g., Exxon Shipping Co. v. Exxon Seamen's Union*, 993 *F*.2d 357 (3d Cir.1993) (vacating reinstatement of seaman, charged with steering oil tanker, whose blood alcohol content was four times Coast Guard limit); *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 847 *F*.2d 775 (11th Cir. 1988) (vacating arbitration award reinstating postal employee who stole mail); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 *F*.2d 665 (11th Cir.1988) (vacating arbitration award permitting pilot who flew while intoxicated to return to position), *cert. denied*, 493 *U.S.* 871, 110 *S.Ct.* 201, 107 *L.Ed.*2d 154 (1989); *Amalgamated Meat Cutters & Butcher Workmen of N. Am., Local Union 540 v. Great W. Food Co.*, 712 *F*.2d 122 (5th Cir.1983) (reversing reinstatement of tractor-trailer driver who caused vehicular accident after consuming alcohol at rest stop); *Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 323 *Ill.App.*3d 168, 256 *Ill.Dec.* 332, 751 *N.E.*2d 1169 (remanding matter concerning arbitral reinstatement of firefighters who responded to emergencies while inebriated), *appeal denied*, 196 *Ill.*2d 538, 261 *Ill. Dec.* 346, 763 *N.E.*2d 316 (2001). *But see Nw. Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 808 *F*.2d 76 (D.C.Cir.1987) (reinstating

pilot who consumed alcohol within twenty-four hours of flight), *cert. denied,* 486 *U.S.* 1014, 108 *S.Ct.* 1751, 100 *L.Ed.*2d 213 (1988).

Importantly, in upholding an award reinstating a recidivist drug-user to his position as a truck driver, the United States Supreme Court "recognize[d] that reasonable people can differ as to whether reinstatement or discharge is the more appropriate remedy here. But both employer and union have agreed to entrust this remedial decision to an arbitrator." *E. Associated Coal Corp., supra,* 531 *U.S.* at 67, 121 *S.Ct.* at 469, 148 *L.Ed.*2d at 364. So too, in this appeal. Although reasonable minds may disagree concerning whether termination or reinstatement is the appropriate remedy, the parties have delegated the duty to resolve that dispute to the sound discretion of a mutually-selected arbitrator. They bargained for and agreed to the Arbitrator's jurisdiction to render a final and binding award in such disputes. They received an award that was, at the very least, "reasonably debatable." Accordingly, we thus must defer to the Arbitrator's disposition of the matter and reinstate the award.

## V.

We hold that the public policy exception to the review of labor arbitration awards and *Weiss'* heightened judicial scrutiny are triggered only when the arbitrator's award—not the grievant's underlying conduct—violates a clear mandate of public policy embodied in statute, regulation, or legal precedent. In doing so, we reverse the Appellate Division's judgment because no clear mandate of public policy was implicated by the present award reinstating the employee to his position as a toll collector. Our holding recognizes the deference owed to arbitrator's decisions, particularly in this labor dispute where the award imposes a considerable penalty—an eleven-month, unpaid suspension—against a public employee who admitted that he committed an act of "extreme stupidity." This matter simply does not present the "rare circumstances" that warrant vacation of an arbitral award

under the public policy exception. *Tretina Printing, Inc., supra,* 135 *N.J.* at 364, 640 *A.*2d 788.

We reverse the judgment of the Appellate Division and remand the matter for the entry of an order enforcing the Arbitrator's award.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, WALLACE, RIVERA-SOTO and HOENS—5.

*Opposed*—None.