**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3459-19

ROBBINSVILLE EDUCATION
ASSOCIATION,

     Plaintiff-Appellant,

v.

ROBBINSVILLE BOARD OF
EDUCATION,

     Defendant-Respondent.

_____

Argued August 2, 2021 – Decided August 16, 2021

Before Judges Mawla and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2447-19.

Sanford R. Oxfeld argued the cause for appellant (Oxfeld Cohen, PC, attorneys; Sanford R. Oxfeld, of counsel and on the brief; Jesse Humphries, on the brief).

Matthew J. Giacobbe argued the cause for respondent (Cleary Giacobbe Alfieri Jacobs, LLC, attorneys; Matthew J. Giacobbe, of counsel and on the brief).

PER CURIAM

Plaintiff Robbinsville Education Association (Association) appeals from a March 26, 2020 Law Division order affirming an arbitration award entered in favor of defendant Robbinsville Board of Education (Board). We affirm.

Pursuant to paragraph 14.1 of a collective negotiations agreement (CNA), the parties agreed as follows:

> Healthcare Coverage: The Board shall provide healthcare coverage . . . equal to the New Jersey School Employees' Health Benefits Program (SEHBP) Direct 15.[1] As required by [New Jersey] law under the provisions of Chapter 78, P.L. 2011,[2] employees are required to pay a contribution toward the cost of health benefits coverage based on a specified percentage of the medical and prescription drug plan premiums. The Board . . . assumes the balance of the costs per this [a]greement.

In 2018, the Board proposed a change to the health benefit administration by implementing a "Difference Card" that Association members could use to pay for medical services for the 2018-19 school year. The prior school year, the Board provided three health plans including one through Aetna, which had a

---

[1] The Direct 15 health plan has a fifteen-dollar co-pay.

[2] Chapter 78 codified as N.J.S.A. 52:14-17.28c, collectively with N.J.S.A. 18A:16-17.1(a), governs the provision of health care coverage for school board employees, the percentage of contribution by employees to their medical coverage, and negotiation of these obligations by means of a CNA.

fifteen-dollar co-pay in accordance with paragraph 14.1 of the CNA. The plan cost the Board $4,448,201. However, in May 2018, Aetna advised the Board the cost for the same plan for 2018-19 school year would increase by nine percent to $4,848,491. As a result, the Board discontinued the fifteen-dollar co-pay plan and maintained three plans with Aetna each requiring a fifty-dollar co-pay. It then contracted with Difference Card to provide Association members with credit cards to pay the thirty-five-dollar difference between their fifteen-dollar co-pay under the CNA and the fifty dollars required by the less expensive Aetna plan. The new plan cost the Board $3,032,318; the Difference Card charged the Board $844,718 to cover the difference in co-pays; and the Board's total cost for providing insurance was $3,877,036 for the 2018-19 school year.

The Association filed a grievance and request for binding arbitration with the Public Employment Relations Commission (PERC). Pursuant to the parties' agreement, PERC designated an arbitrator who considered the evidence and heard testimony from Alexander DeVicaris, a New Jersey Education Association (NJEA) field representative, on behalf of the Association, and Joseph Columbo, an insurance broker, on behalf of the Board. The arbitrator issued a detailed twenty-two-page written decision, and at the outset framed the question presented as follows: "Did the Board violate Article 14.1 of the parties'

[CNA] or the related statutes with regard to the Chapter 78 contributions the employees were required to pay toward their health benefits in the 2018-2019 school year? If so, what shall be the remedy?"

The Association argued the Board violated the CNA and the law because Difference Card was not an insurance carrier or health care provider and instead issued a "carrier neutral" credit card, which did not provide medical benefits, to pay claims. The Association also argued the cost paid to Difference Card was not chargeable to its members because it was not a fixed insurance premium, but could increase depending on the cost of the claims in a given year. The Association claimed the Board should pay twenty percent of the Board's cost for the Difference Card, or $168,944.

The Board argued it violated neither the CNA nor the statute because the co-pay remained at fifteen dollars and the amount paid by the Difference Card represented a portion of the insurance premium, which happened to be self-insured. The Board claimed the Difference Card was a form of self-insurance as defined by Section 39 of Chapter 78, which states:

> As used in this section, "cost of coverage" means the premium or period charges for medical . . . plan coverage . . . provided under the . . . [SEHBP]; or the premium or periodic charges for health care . . . provided pursuant to P.L.1979, c.391 (C.18A:16-2 et seq.), [N.J.S.A. 40A:10-16] et seq., or any other law by

a local board of education, local unit or agency thereof . . . when the employer is not a participant in the . . . [SEHBP].

[N.J.S.A. 52:14-17.28c.]

The arbitrator recounted the testimony of both witnesses, noting DeVicaris testified that a Difference Card employee, who did not testify, told him Difference Card was not a healthcare provider. The arbitrator stated:

> But even if I credit that remark it only means that the Difference Card itself did not provide medical benefits. That's true to a certain extent; the Difference Card itself was not paying to keep the employee co-pay at [fifteen dollars]. Rather, it was facilitating – or administering – that result on behalf of the Board by letting the employee health providers use its credit card to cover the balance of the [fifty dollar] co-pay. Consequently, I find that [the non-testifying witness'] remark does not mean that the Board did not provide a medical benefit by paying the co-pay difference so that the employees' health care plan would remain at the [fifteen dollar] co-pay.
>
> . . . [T]he cost to maintain and/or to lower the co-pay must be part of the overall premium or cost of the overall health benefit plan. Based thereon I find that the [thirty-five dollars] the Board paid the Difference Card towards the co-pay was part of the medical benefit that the Board was required to provide for the employees as part of their overall medical benefits. Even DeVicaris recognized that the co-pay is part of a health plan[']s medical expense.

A-3459-19

The arbitrator concluded although the Difference Card was not an insurance carrier or provider, "it did provide a medical benefit paid by the Board." Furthermore, citing Article 14.1 of the CNA, the arbitrator noted it did not require the Board to provide insurance solely through a carrier. Rather, the "Article only requires a contribution to the cost of health coverage based upon a percentage of the medical and prescription drug plan premiums." Canvassing the exhibits entered into evidence, the arbitrator could find no requirement that insurance be provided only through a carrier.

The arbitrator concluded the Difference Card was a form of self-insurance. He stated:

> I see very little difference between the Board paying Aetna a higher cost – or premium – to provide a [fifteen dollar] co-pay plan and the Board paying the Difference Card a cost – or premium – to maintain a [fifteen dollar] co-pay plan for the employees. In both situations it is the Board that pays a cost to a company – as part of its overall health benefit premium – to provide the employees with the [fifteen dollar] co-pay benefit.

The Arbitrator also credited Columbo's testimony, which stated the Difference Card acted as a form of third-party administrator of benefits and was a form of self-insurance because it employed actuaries to determine its rates by considering "the group claims experience and how much is needed to cover the full cost of the claims plus the [Difference Card's] expenses." The arbitrator

6

noted DeVicaris testified "he was unfamiliar with self-insurance plans; and he certainly did not dispute Columbo's testimony."

The arbitrator rejected the Association's argument the Difference Card was a form of health savings account, noting such accounts are created by employees because of the benefits of funding an account with pre-tax earnings, and are not funded by employers. The arbitrator also found the fact that the cost of the Difference Card could fluctuate based on the claims it processed did not mean it was not a form of self-insurance because its purpose was to "provid[e] the employees the required lower co-pay."

The arbitrator concluded as follows:

> Thr[ough] the Difference Card the Board is providing part of the contractually required coverage. . . . The Board alone – in part due to the language in Article 14.1 of the parties' [a]greement – is responsible for any increase in co-pay claims the Difference Card may subsequently charge the Board. Absent a negotiated agreement on this point, the employees are not required to pay contributory shares on any such increase.

Addressing the statute, the arbitrator concluded as follows:

> Combining the premium for the Aetna [fifty dollar] co-pay fully-insured plan and the premium for the Difference Card co-pay self-insured plan for purposes of determining an employee's required Chapter 78 contribution seems consistent with the [CNA] and the law. [See] . . . N.J.S.A. 40A:10-21.1(d) which provides in pertinent part:

7

This section shall apply when the health care benefits are provided through self insurance, the purchase of commercial insurance or reinsurance, an insurance fund or joint insurance fund, or in any other manner or any combination thereof. [(Emphasis added).]

[The highlighted language] fits what happened here. The Board found another way, another manner, in which to provide the [fifteen dollar] co-pay at a lower cost, but that self-insured cost combined with the fully funded cost for the Aetna [fifty dollar] co-pay plan resulted in the combined premium upon which the employee contributory share was determined.

The arbitrator denied in part the grievance concluding the Board did not violate the CNA by including the Difference Card in its overall health benefits premium. However, the arbitrator held that if the Difference Card claims for 2018-19 were less than the $844,718 premium paid, the Board had to immediately notify the Association of the sum refunded to the Board and negotiate "how best to return the employees['] contributory share from such money [and] . . . the negotiable aspects of [the CNA, including] the use of the Difference Card plan for the 2019-2020 school year."

The Association filed an order to show cause and verified complaint asking the Law Division judge to vacate the arbitrator's award and "determine that no staff member should have been required to make Chapter 78

contributions on the cost of the Difference Card." The trial judge reviewed the parties' submissions and heard oral argument on the order to show cause.

As part of the Association's submissions, it included a certification from an NJEA associate director of research and economic services who did not testify before the arbitrator. The certification opined the arbitrator made "most of the correct factual findings, [but had] misconstrued the law," namely, Chapter 78, in concluding the Difference Card was a form of self-insurance. The affiant certified he reviewed the Difference Card website, which stated: "The Difference Card works like a credit card to offset copays and deductibles" and therefore was not a form of medical insurance premium. Additionally, citing the website, he noted Difference Card did not hold itself out as a third-party administrator of health benefits. The certification concluded this information was "directly contrary to the arbitrator's ruling."

The Board's counsel objected to the judge's consideration of the certification on hearsay grounds pursuant to Rule 1:6-6 and because the affiant was present at the arbitration, but never called to testify. The trial judge concluded he would consider the factual assertions made because they were derived from the Difference Card website, which did not require testimony, but

would not consider the legal arguments raised by the affiant because the Association's counsel could articulate them.

Association counsel argued the judge should vacate the arbitration award pursuant to N.J.S.A. 2A:24-8(a) because the arbitrator's finding that the Difference Card was a form of insurance premium chargeable to Association members constituted a mistake of law. Counsel also argued the award should be vacated under N.J.S.A. 2A:24-8(d) because the arbitrator failed to consider Chapter 78 despite identifying the statute in the issue to be arbitrated.

The trial judge rejected the Association's arguments. He concluded the arbitrator's finding the Difference Card was a form of insurance premium was supported by the record and

> fits within the terms of the statute and since its cost of coverage, it also fits within the terms of the contract. I don't know how else to see it [except as] periodic coverage for medical. That's what it was. It was for a set period, 2018/2019, it is for medical and it's for the coverage.

The trial judge rejected the arguments made in the certification from the NJEA associate director, namely that the Difference Card website states it is not a form of insurance. The judge stated:

> I'm not constrained to have to do what the Difference Card says and neither was the arbitrator. They can

10

claim whatever they want in their advertisements and for their business model.

The fact of the matter is essentially it's a self-insurance. They administer it for the . . . Board and I take it that the . . . Board is probably not that expert in things like invoices and billing codes and all the things that need to be done to be able to sort these things out. So[,] it makes sense that they got somebody else to do it.

The judge entered the order affirming the arbitration award.

I.

Recently, our Supreme Court framed the principles guiding our review.

Writing for the Court, Justice Pierre-Louis stated:

To foster finality and "secure arbitration's speedy and inexpensive nature," reviewing courts must give arbitration awards "considerable deference." [Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 201 (2013)] (quoting Middletown Twp. PBA Loc. 124 v. Twp. of Middletown, 193 N.J. 1, 10 (2007)). "[A]rbitration is 'meant to be a substitute for and not a springboard for litigation.' Arbitration should spell litigation's conclusion, rather than its beginning." N.J. Tpk. Auth. v. Loc. 196, IFTPE, 190 N.J. 283, 292 (2007) (quoting Loc. No. 153, Off. & Pro. Emps. Int'l Union v. Tr. Co. of N.J., 105 N.J. 442, 449 (1987)).

The interpretation of a labor agreement "is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him [or her]" based solely on differences of interpretation. E.

11

Rutherford PBA, 213 N.J. at 202 (quoting Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 433 (1996)). Accordingly, an arbitrator's award resolving a public sector dispute will be accepted so long as the award is "reasonably debatable." Id. at 201-02.

Under the reasonably debatable standard, a court "may not substitute its own judgment for that of the arbitrator, regardless of the court's view of the correctness of the arbitrator's position." Ibid. (quoting Middletown Twp. PBA, 193 N.J. at 11). Put differently, if two or more interpretations of a labor agreement could be plausibly argued, the outcome is at least reasonably debatable. See id. at 206; PBA Loc. 11 v. City of Trenton, 205 N.J. 422, 430 (2011). "Thus, even if the remedy the Arbitrator fashioned was not the preferred or correct outcome, a reversal would be contrary to the deferential standard for reviewing arbitral decisions." E. Rutherford PBA, 213 N.J. at 206.

[Borough of Carteret v. Firefighters Mut. Benevolent Ass'n, Loc. 67, ___ N.J. ___, ___ (2021) (slip op. at 11-12) (second and third alterations in original).]

In pertinent part, the New Jersey Arbitration Act also permits a court to vacate an arbitration award in any one of the following cases: "[w]here the award was procured by . . . undue means" or "[w]here the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made." N.J.S.A. 2A:24-8.

The Association raises the following arguments: (1) because the issue before the arbitrator concerned the statutory interpretation of Chapter 78, we

12

should exercise de novo review because the dispute is "a purely legal issue;" (2) the trial judge erred by failing to vacate the award pursuant to N.J.S.A. 2A:24-8(a) and (d); (3) the arbitration award is invalid because the arbitrator failed to decide the issue presented, namely, whether the Board had violated Chapter 78; and (4) the trial judge erred because the Difference Card is not health insurance that is chargeable to Association members under Chapter 78. We address these arguments in turn.

We decline to exercise a de novo review because the arguments raised by the Association are not "purely legal." Even if this were so, as we have expressed, our scope of review is narrow and requires us to consider whether the arbitration award is reasonably debatable. Contrary to the Association's argument, neither the arbitrator nor the trial judge ignored Chapter 78 or misapplied the law. The arbitrator made detailed findings explaining how the Difference Card satisfied the Board's obligation to provide the insurance coverage required by Chapter 78 and the requirement that the Board and the Association enter into negotiations in the event of a premium refund from the Difference Card. For these reasons, a de novo review is unwarranted.

The Association argues the award should be vacated pursuant to N.J.S.A. 2A:24-8(a) because the award was procured by "undue means," namely, the

arbitrator committed mistakes of fact and law. In this regard, the Association urges us to consider the certification it submitted to the trial judge from the NJEA representative, which purported to explain why the Difference Card was not a form of Chapter 78 compliant medical insurance. However, the certification was produced four months after the arbitrator's ruling and the Association could have adduced testimony from the affiant during the arbitration proceedings, but did not. Notwithstanding the failure to have the affiant testify, the judge did consider the factual assertions made in the post-arbitration certification. We discern no error on the part of the trial judge and the certification does not prove the sort of mistake envisioned under N.J.S.A. 2A:24-8(a) to warrant vacation of the arbitration award.

The balance of the arguments raised by the Association urging us to vacate the award on grounds of mistake challenge the arbitrator's finding that the funds paid to the Difference Card constituted a form of self-insurance. The Association argues the arbitrator ignored DeVicaris's testimony, which explained that Difference Card was not a form of insurance. Citing the Department of Education and Aetna's definitions of health insurance premiums, namely, "the payment made to maintain a health insurance policy" and "regular payments to keep [a] health care plan active," the Association argues the

14

arbitrator erred because the Difference Card "does not match" such definitions and "the Difference Card serves absolutely no purpose in maintaining an active health insurance policy." The Association also asserts the arbitrator ignored the Difference Card's own representations that it was carrier neutral and was not a health insurance provider.

Again, we discern no error requiring our intervention under N.J.S.A. 2A:24-8(a). Initially, we note the arbitrator did not ignore any evidence, including DeVicaris's testimony. Rather, it is evident the arbitrator found Columbo's testimony and the Board's evidence more persuasive. Moreover, contrary to the assertions made in its brief, the Association's challenge is rooted in its disagreement with the arbitrator's factual findings and conclusions of law.

In Borough of Carteret, the Supreme Court confronted a similar scenario. There, the CNA stated senior firefighters were entitled to an acting captain's pay when they performed the duties of a fire captain. ___ N.J. at ___ (slip op. at 2). However, the Borough avoided paying the higher pay by creating a lieutenant position within the fire department. Id. at ___ (slip op. at 4-5). At the ensuing arbitration hearing, the Borough presented testimony that the firefighter's union agreed to waive the captain's pay if the Borough created the lieutenant position. Id. at ___ (slip op. at 6). The union presented testimony that there was no such

agreement.  Both parties agreed the lieutenants were performing a captain's duty. Ibid.

The arbitrator sided with the union and found the Borough had violated the CNA and awarded back pay at the captain's rate.  Ibid.  The arbitrator's written opinion addressed both witnesses' testimony and explained why the arbitrator had decided to credit the testimony of the union's witness over the Borough's.  Id. at ___ (slip op. at 7).  The trial court upheld the award and denied the Borough's request to vacate it pursuant to N.J.S.A. 2A:24-8(d).  Id. at ___ (slip op. at 8).

We reversed and vacated the arbitrator's award holding the arbitrator had "engrafted" language into the CNA and the agreement's plain language showed it did not apply to lieutenants.  Ibid.  Moreover, as explained by the Supreme Court,

> [t]he Appellate Division was persuaded by the Civil Service Commission's job descriptions for fire personnel.  It noted that absent from the job description for firefighters was any provision suggesting that a firefighter must assume captain's duties when a captain is not scheduled.  Consequently, when a firefighter performs captain's duties, the firefighter is performing work beyond his or her job description.  According to the court, that is why [the CNA] provides for greater compensation in those instances.  The Civil Service Commission's description of fire lieutenants, by contrast, expressly directs that a lieutenant "[act] in the

16

place of a Fire Captain in his/her absence." The Appellate Division found nothing in the record to support the FMBA's argument that lieutenants should receive acting captain's pay "for performing work within their job description."

Finding that the difference between firefighters' and fire lieutenants' job descriptions created uncertainty as to [CNA's] application to lieutenants, the Appellate Division concluded that the arbitrator should have given greater consideration to the parties' past practice; namely, that for four years, lieutenants in the Carteret Fire Department regularly assumed captains' responsibilities without demanding pay beyond that to which they were ordinarily entitled.

[Id. at ___ (slip op. at 8-9) (third alteration in original).]

The Supreme Court reversed, reinstated the award, and held as follows:

Although the Appellate Division's conclusion is arguably plausible in its own right, the court improperly substituted its own judgment for that of the arbitrator in vacating the arbitral award. We find that the arbitrator's award is supported by a reasonably debatable interpretation of the disputed provision, and therefore, the award should have been upheld on appeal.

. . . .

As our precedent indicates, affirming an arbitrator's award is not a comment on the viability of opposing interpretations of a disputed labor agreement, "[n]or is it a conclusion that the arbitrator's interpretation is the best one. That is not the standard. What is required is that the arbitrator's interpretation finds support in the Agreement . . . ." PBA Loc. 11, 205 N.J. at 432. Here, we find that it does.

17

[Id. at __ (slip op. at 2-3, 16) (alterations in original).]

The same principles apply here. The arbitrator explained his reasons for deciding in Board's favor, having considered all the evidence, testimony, and legal arguments presented. Although the arbitrator could have reached the outcome the Association desired based on the same record, it is not our role to second guess the result because it is reasonably debatable.

The Association claims the Arbitrator violated N.J.S.A. 2A:24-8(d) because "Chapter 78 is included in the statement of the issue to be decided by the arbitrator as well as in the [CNA] by reference and by failing to read both together, the arbitrator imperfectly executed his powers so that a final award was not issued." We disagree.

The trial judge found the arbitrator did address Chapter 78, stating "that the money was charged for medical for a given . . . period . . . [and] in fact[] fits within the terms of the statute . . . ." The judge concluded as follows:

> So[,] Section 39 of Chapter 78 says that the premium of periodic charges for medical and that's what I'm saying . . . and that's where we've defined it as the cost of coverage. So the premium is . . . what it costs. The period is 2018/2019 and it's for medical. The other three elements were met and that's why I find that it meets that statute.

18

This argument and the Association's remaining argument that the record does not support a finding the Difference Card was a form of health insurance chargeable under Chapter 78 lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-3459-19