**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2217-22

VLADIMIR S. BOZIC, M.D.,

     Plaintiff-Respondent,

v.

ORTHOPEDIC EMERGENCY
SERVICES SPRINGDALE, L.L.C.,
d/b/a SPRAINS, STRAINS &
FRACTURES, ORTHOPEDIC &
NEUROSURGICAL SPECIALISTS,
LLC, and ROBERT M. DALSEY,
M.D.,

     Defendants-Appellants.

_____

Argued March 13, 2024 - Decided July 1, 2024

Before Judges Currier, Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2758-22.

Thomas J. Hagner argued the cause for appellants (Hagner & Zohlman, LLC, attorneys; Thomas J. Hagner and Thomas A. Hagner, on the briefs).

Jeffrey R. Johnson argued the cause for respondent (Brown & Connery, LLP, attorneys; Jeffrey R. Johnson, on the brief).

PER CURIAM

Defendants appeal from the March 22, 2023 order confirming an arbitration award in favor of plaintiff, entering final judgment against defendants jointly and severally, and individually against defendant Robert M. Dalsey, M.D., and awarding plaintiff attorney's fees and costs. We affirm.

I.

We derive our facts from the evidence presented during the arbitration hearing. Plaintiff is a board-certified orthopedic surgeon. He began working at defendant Orthopedic & Neurosurgical Specialists, LLC (ONS) in 2008 and at defendant Orthopedic Emergency Services Springdale, L.L.C. d/b/a Sprains, Strains & Fractures (SSF) in 2009. Plaintiff became a member of both practices in 2010.[1] Dr. Dalsey, also a board-certified orthopedic surgeon, was the managing member of both practices.

In 2011, to procure a line of credit, plaintiff, Dr. Dalsey and three other members executed an operating agreement (OA) to govern ONS's operation. Plaintiff did not have an attorney review the OA.

---

[1] ONS ceased operating at some point in 2019 or 2020.

At the same time, plaintiff, Drs. Dalsey, Michael P. Barrett, D.O., and Michael S. Levy, D.O., executed a letter of agreement (letter agreement), declaring the four members were "equal owners and members and employees of ONS" with "equal rights." The letter agreement stated, "[U]pon any partner leaving this practice, the departing member will be entitled to 25[%] of the money, owned assets, and outstanding receivables minus a 5% billing charge for collected receivables." It also provided, "Any outstanding malpractice liability insurance fees for any departing physician will be the responsibility of [ONS]."

SSF is also governed by an Operating Agreement (SSF OA), executed in 2013 by plaintiff, Drs. Dalsey, Barrett, Levy, Christopher Carey, M.D., and Nathan D. Bodin, M.D. Provisions pertinent to this appeal state:

ARTICLE IV
MANAGEMENT AND OPERATIONS

4.1 Manager. . . . If so elected, the Managing Member shall be responsible for the operation of [SSF] business in the ordinary course and shall have the authority to do all things, without the consent of the Members, that it determines, in its sole discretion, to be in furtherance of the purpose of [SSF], and shall have all the rights, powers[,] and privileges available to a "manager" under the New Jersey Limited Liability Company Act, [N.J.S.A. 42:2B-1 to -70 (2014) (repealed by L. 2012, c. 50, § 95)] unless restricted by separate agreement. The Manager shall have the right to enter into and execute all contracts, documents and

3

other agreements on behalf of [SSF] and shall thereby fully bind [SSF]. . . .

4.2 Managing Member. Until changed by majority vote of the Voting Members, the Managing Member shall be Robert M. Dalsey, M.D.

. . . .

ARTICLE VI
MEMBERS' DUTIES

. . . .

6.3 Member's Duties. Each Member shall have the highest duty of loyalty to the other Members and to [SSF].

. . . .

ARTICLE IX
TRANSFERS OF [SSF] INTERESTS

. . . .

9.2 Withdrawals. No Member may resign or withdraw from [SSF] other than [because of] death, disability[,] and retirement, unless and until such resignation or withdrawal has been approved by a majority vote of all of the remaining members in good standing, both Voting and Non-Voting Members. If a Member resigns or withdraws from [SSF] without such approval, such Member shall thereafter be deemed to be in default.

. . . .

4

# ARTICLE X
## SPRAINS, STRAINS, & FRACTURES

. . . .

10.2  Employment.  It is the express intent of the parties that all Members be employed by the Company on a regular basis, and that the terms and conditions of that employment be the subject of a separate agreement. . . .

. . . .

# ARTICLE XI
## DIVESTITURE OF INTEREST

. . . .

11.3  Compensation Upon Divestiture.  Absent malfeasance on the part of the Member subject to divestiture, that Member shall be compensated for his or her interest in the Company as follows:

a. The divesting Member's original cash, out-of-pocket investment shall be returned in four[,] equal, annual installments.

b. The divesting Member shall receive his or her proportionate share of the trailing receivables for services rendered through the date of divestiture, paid in quarterly installments, as collected, subject to the following conditions:

(1) All receivables shall be reduced by an 8% fee on gross revenue for collection

5

costs, records management, and operational expenses.

(2) Any receivables not collected within 360 days of the date of divestiture shall become the property of the Company, free of any claims by the divesting Member.

c. The divesting Member shall have no other claims to compensation or reimbursement against the Company nor any other Member for revenues or assets.

. . . .

ARTICLE XIV
GENERAL

14.1 Dispute Resolution. Notwithstanding any term used herein referring to litigation, legal proceedings, legal action, or the like, any issue, controversy, claim or dispute which shall arise with regard to the performance or interpretation of any section of this Agreement shall be first submitted [to] mediation through the American Health Lawyers Association Alternative Dispute Resolution Service (AHLA), with costs borne equally by the parties. If the matter is not resolved thr[ough] mediation, the matter shall be submitted to binding arbitration[] before a single arbitrator through AHLA, which . . . shall be held in Camden County, New Jersey.

Plaintiff testified he believed he was an employee and a member of SSF

as stated in Section 10.2 of the SSF OA, but also because he

6

receive[ed] regular payments, regular benefits[,] and salary. We were receiving contributions to retirement accounts, a 401(k)[,] and [a] profit[-]sharing retirement account for SSF. We were receiving typical employee benefits, such as health insurance . . . . [I]t was also the understanding of all the parties that we were employees . . . of the practice.

He also applied for and received unemployment benefits from New Jersey after he left the practices in June 2020.

In 2012, ONS and SSF partnered with Salem Medical Center (Salem) to provide orthopedic services to two locations. Dr. Dalsey did not work or provide coverage at Salem despite receiving an equal share of the revenue. The other doctors split up the shifts and on-call hours. Revenue from Salem went to ONS and was split evenly among the members; the revenue from the call shifts passed through SSF directly to the doctors who worked the shift. According to plaintiff, he discussed his concern about Dr. Dalsey not working at Salem with the other members "many times."

Plaintiff testified his relationship with Dr. Dalsey was "good" and "fine" and that he "trusted him" when they began working together. In 2013, plaintiff and Dr. Dalsey equally invested in a business venture to open a brewery, along with a third non-investing partner who would run the brewery operations. However, the relationship soured after Dr. Dalsey drafted an OA under which

7

he was "the managing member with complete control of the brewery." Plaintiff eventually left the venture.

Plaintiff testified that Dr. Dalsey only worked at SSF Monday through Thursday, whereas the other doctors shared seven days of shifts. In addition, Dr. Dalsey paid himself a $10,000 monthly "management fee" or "licensing fee" from SSF each month. Plaintiff said he questioned Dr. Dalsey and the other doctors about it, but the other members were either afraid of Dr. Dalsey or didn't want to "make waves." He further noted that "Dr. Carey had a big problem with" the fee and "thought it was completely unjustified."

Plaintiff stated the members never voted to approve the fee. However, during a meeting in 2015, a document titled "Licensing Agreement" was circulated, which provided for a payment from SSF to Dr. Dalsey of $120,000 per year or 5% of gross revenue—equating to $10,000 a month. The document was not discussed, and no one signed it.

In early 2015, ONS and SSF members had "general discussions" about hiring a law firm to review the practices' OAs. At that time, Dr. Bodin was soon to become a member, and he "proposed ideas" to make the OAs "better." In June 2015, plaintiff received an email from ONS office manager Linda Rappaport, forwarding an email chain and attachment. The initial email in the

chain, sent in April 2015, was from an attorney at Blank Rome LLP to Dr. Bodin, stating:

> I attached a memo with a current analysis of the SSF and ONS Operating Agreements and positions we think that ONS and SSF can take regarding [plaintiff].
>
> Kevin jumped in to assist with the analysis and I think we have come to a place that you'll be happy with the terms of defending ONS and SSF from an attack by [plaintiff].
>
> We were wondering, however, whether the ONS Letter Agreement has ever been changed taking into account the additional doctors as well as what the assets of ONS are.
>
> All of these thoughts are included in the attachment. Once you have a chance to review and think about it, please give either of us a call.

Dr. Bodin had forwarded the email to Dr. Dalsey who sent it to Rappaport in turn.

Plaintiff testified that the memorandum attached to the email chain stated in part, "[Y]ou asked us to review and analyze the [OAs] of SSF and ONS to assess the exit provisions, the rights and obligations of [plaintiff] should he choose to exit and a strategy for dealing with such exit when and if it occurs." He further testified the memorandum said "that the LLC could apply for a Judicial Order by instituting a lawsuit to expel a member" for

9

engaging in wrongful conduct, materially breaching the [OA,] or the member's conduct makes it impractical to carry on the business of the LLC with the person as a member.

. . . [W]e do not believe these circumstances are present at the time according to the information that you have provided . . . .

. . . .

Moreover, we understand that litigation is an un-preferred course of action at the present time; therefore, short of any legal action or a Court Order, the only way a member could be disassociated is by announcing his intent to do so.

. . . .

. . . [A]lthough these sections appear to only apply to death, disability[,] or retirement, it is possible that [plaintiff] may argue that he is entitled to a fair market valuation because he is a withdrawing member.

. . . .

. . . [T]hus, there is a risk that [plaintiff] could seek this relief . . . .

. . . [O]bviously, this section only applies if the member[] is going to work for a competitor, and we do not believe—at the present time—[plaintiff] will do so . . . .

. . . .

10

. . . SSF could take the position that [plaintiff] is entitled to his own contributions and trailing receivables . . . .

. . . [A]ny option that the LLC pursues that is short of what [plaintiff] demands has the potential [to] provoke litigation for breach of the [OA] or breach of the [Revised Uniform Limited Liability Company Act (RULLCA), N.J.S.A. 42:2C-1 to -94], as this statute applies to protected minority shareholders. . . .

. . . .

. . . [F]inally, [plaintiff] could attempt to transfer his shares to someone else; however, that would require providing SSF with a right of first refusal and the opportunity to purchase the share on the same terms.

[Plaintiff] could attempt to construct a reasonable offer and unreasonable terms in an attempt to force the LLC to meet those terms, but such a situation seems highly unlikely and will require a bona-fide offer by a third party. At present, there is no indication that this is a possibility.

Plaintiff testified that Rappaport asked him not to tell Dr. Dalsey she had shared the email with plaintiff because he would fire her. Thereafter, plaintiff discussed the email with Dr. Bodin, who said Dr. Dalsey told him plaintiff is a "bad guy" and "troublemaker" that is "going to ruin the practices." According to plaintiff, Dr. Bodin said Dr. Dalsey encouraged him to ask Blank Rome to review the OAs and that he would be reimbursed for the costs.

When plaintiff suggested they discuss the issue of reviewing the OAs in a meeting, Rappaport sent him an "altered" version of the April 9 memorandum, in which plaintiff's name and references to him had been removed. Rappaport told plaintiff she "altered the document at the request of Dr. Dalsey." Plaintiff testified it was clear to him that "Dr. Dalsey and Dr. Bodin[] were conspiring behind [his] back," and "Dr. Dalsey was clearly trying to manipulate a new doctor."

Despite the Blank Rome memorandum, plaintiff testified the practices continued functioning as usual and "no obvious problems" arose until December 2018. At that time, the doctors were not paid their full salary or guaranteed payments, and they learned some bills were not paid.

In February 2019, Dr. Bodin discussed his intention to leave ONS, but continue working at SSF. During a meeting with all the ONS doctors, Drs. Dalsey, Barrett, and Levy said Dr. Bodin could not leave ONS because they did not accept his resignation and he had a debt obligation. Plaintiff testified that at no time thereafter did the three doctors specify what the debt obligation was for, or why other doctors were permitted to leave the practices in 2009-2011 without any discussion of a debt obligation. At the same meeting, Dr. Dalsey circulated a document that plaintiff had not previously seen—titled "Operating Agreement

12

and Company Records of [ONS] (2017 OA)." The document was dated March 8, 2017, and only signed by Dr. Bodin.

In either March or April 2019, Dr. Dalsey proposed that he receive a yearly $50,000 management fee payment from ONS, to which Drs. Levy and Barrett agreed. Plaintiff testified there was no prior discussion regarding the management fee, and he was "astonish[ed]" by the proposal since the doctors had not been paid for months and the financial status of ONS was unclear. Nevertheless, the proposal was passed by a three to two vote.

In April 2019, a meeting took place with Drs. Dalsey, Barrett, Bodin, Levy, plaintiff, and two attorneys from the Parker McCay, P.A. law firm in attendance. A Letter of Engagement with Parker McCay, dated March 1, 2019, with lines for Drs. Dalsey, Levy, and Barrett's signatures was distributed, as well as the March 8, 2017 OA document signed by Dr. Bodin.

According to plaintiff, during this time the partners were still working, but no one was getting paid at ONS and there was no explanation for it. After Dr. Bodin stopped working at ONS, he was also removed from the SSF call schedule and not given any new patients. There was no discussion before these actions were taken.

Plaintiff testified he sent a letter to the other ONS doctors on October 20, 2019, "to reiterate [his] concerns about the financial affairs of ONS and its continued viability." In the letter, plaintiff indicated that "since the end of 2018, ONS's financial condition has fundamentally changed for the worse," there had been almost no distributions made to members, "the managing member recently identified a new and unspecified debt obligation of ONS," and that "ONS's managing member announced he will leave ONS at the end of 2019 or possibly early 2020."

SSF paid its members for the first two quarters in 2019, but Drs. Dalsey, Levy, and Barrett decided to stop the payments in the third quarter. Plaintiff testified he was told the practice "need[ed] to keep money to settle with [Dr.] Bodin," but payments to members would resume, including back payments for the missed quarters, after the settlement.

The relationship among the doctors continued to deteriorate. Following a meeting in May 2019, plaintiff sent the following email to the other doctors present at the meeting:

> Doctors, I need to address Dr. Dalsey's unacceptable behavior towards me on [May 8, 2019] when Dr. Dalsey verbally attacked me and physically threatened me.
>
> These events occurred during regular ONS hours and were witnessed by multiple employees as well as

Dr. Barrett and Dr. Levy. Additionally, one of our valued employees, Lisa Rudderow, who worked at ONS for nine years and filled multiple roles at ONS, left the office after she was verbally attacked by Dr. Dalsey on the same date, [May 8, 2019].

On [May 9, 2019], she sent an [email] to the doctors documenting the abuse from the prior day and stated that she was not returning to ONS or SSF.

I need to remind all the doctors of the need to treat all members and employees professionally. A hostile work environment exposes all of us to potential claims by employees and the last thing ONS needs is a lawsuit due to inappropriate behavior towards employees.

It's imperative that we all communicate respectfully and professionally with regard to all circumstances.

Plaintiff testified he witnessed multiple incidents of verbal abuse from Dr. Dalsey towards employees during his time at the practices.

Plaintiff stated that during the time he was not being paid, he asked Dr. Dalsey for access to financial records and bank accounts. Dr. Dalsey refused to give him the information.

Thereafter, plaintiff decided to withdraw from ONS and SSF. He advised ONS that he intended to terminate his membership but would continue to work at the practice for "a reasonable period of time . . . to ensure a smooth transition." After there was no response, he sent a second letter in November 2019,

proposing to work as an employee at ONS and giving a termination date of December 15, 2019.

Drs. Dalsey, Barrett, and Levy informed plaintiff they were not accepting his withdrawal. Plaintiff's last date at ONS was approximately December 19, 2019. Thereafter, ONS cancelled his malpractice insurance policy, so plaintiff secured his own insurance coverage while he continued to work at SSF. Plaintiff testified he was not accorded the monies due him as a departing member under the ONS letter agreement and was given "the same debt-obligation" explanation as provided to Dr. Bodin.

In the beginning of 2020, a settlement was reached with Dr. Bodin, but plaintiff still did not receive payments from SSF. Plaintiff testified he was subsequently removed from the call schedule at Salem and his situation with SSF "completely deteriorated" as the COVID-19 pandemic took hold. Plaintiff stated,

> I knew that was it for me and at that point, they're actually asking me to be in a literally unsafe work environment with no plans to resolve that or address it and Dr. Dalsey is not going to work anymore, but better believe he's still going to . . . pay himself $10,000 a month as he had been the entire time.
>
> That was it. That was enough for me.

On March 19, 2020, plaintiff sent a letter to the SSF doctors advising of his intention to terminate his membership in SSF as of the following day. Plaintiff asserted he suffered harm and oppression as a minority member, and that withheld payments and recent efforts to commingle of SSF's assets with ONS led him to "fear that SSF's assets have been misappropriated or squandered." Plaintiff testified that the members continued to assert he owed "debts" but did not say what they were.

## A.

On May 6, 2020, plaintiff filed a Notice of Arbitration with the AHLA against SSF, ONS, and Dr. Dalsey. Under "Jurisdiction and Venue," the Notice stated in pertinent part:

> 7. The American Health Lawyers Association [(AHLA)] Alternative Dispute Resolution Service has jurisdiction over this matter and over the parties pursuant to the SSF Operating Agreement, Article XIV, Section 14.1 . . . .
>
> 8. ONS Operating Agreements are silent regarding forums for dispute resolution. However, all members of ONS are also members of SSF, so the members of ONS favor resolving disputes through arbitration. The SSF dispute resolution provision along with strong state and federal policies favoring arbitration cannot be disputed. The issues and disputes between the [p]arties relating to ONS and SSF are sufficiently related that arbitrating all matters between the [p]arties is

17

unquestionably the most efficient and economic method to resolve all disputes.

Plaintiff alleged the following: breach of contract for failing to compensate him under the OA and legally binding agreements; unjust enrichment for receiving the benefits of plaintiff's medical services without providing compensation; breach of the covenant of good faith and fair dealing for not allowing plaintiff to have a voice in the management and operations of the practices, improper management and operation of the practices, failing to compensate members and employees according to agreements, and not honoring agreements management had entered into and making decisions with the best interests of members and the practices in mind; violations of the RULLCA and the New Jersey Wage Theft Act; failure to provide access to records and information; breach of fiduciary duty and the duty of loyalty; conversion; and fraud.

Plaintiff sought: "entry of a judgment and award in his favor and against [defendants] ONS, SSF[,] and [Dr.] Dalsey, individually and as a member of ONS and SSF;" declaratory judgments to remove Dr. Dalsey as managing member, disgorgement of management fees and payments Dr. Dalsey received as managing member, and the dissolution of ONS and SSF with plaintiff receiving payment before anyone else; compensatory and punitive damages; the

return of plaintiff's capital contributions; a share of the legal and professional fees ONS and SSF incurred in this case and the litigation with Dr. Bodin; attorneys' fees and costs of litigation; an accounting of ONS and SSF's business and financial records; and any other appropriate relief.

On July 31, 2020, the arbitrator issued an order following a status conference call with the parties that stated in pertinent part:

> IT IS ORDERED AND AGREED TO . . . that:
>
> 1. Jurisdiction. Counsel for the parties agree that the precondition of mediation is futile and therefore waived; [c]ounsel also agreed on behalf of the parties that all claims among the parties arising from their business relationship involving [ONS] and [Dr. Dalsey] should be submitted to arbitration under the arbitration provision, set forth in the operating agreement of [SSF].
>
> [(emphasis omitted).]

On August 10, 2020, defendants filed a response, denying plaintiff's allegations and asserting counterclaims of breach of fiduciary duties and breach of contract, and seeking compensatory and consequential damages, interest, costs, and attorney's fees.

The seven-day arbitration hearing was held in April and May 2022. The arbitrator heard testimony from plaintiff, Drs. Dalsey, Barrett, Bodin, Carey,

and Levy, several employees of the medical practices, plaintiff's economic expert, and defendants' accountant.

Plaintiff's testimony has been summarized above. He also denied the substance of defendants' counterclaims.

Dr. Barrett testified: he did not know why the 2017 OA was only signed by Dr. Bodin, but he believed it was an enforceable document; there were no restrictions on a member leaving; he believed a departing member was entitled to "receivables minus the debt and then divide[d]" by the number of members, their "share of cash on hand," and their share of the "debt incurred up to the date of departure," as well as "some" future debt, such as rent, labor costs, and vendor agreements; and that a prior departing member from SSF was not charged with a debt obligation because the members "thought that was fair."

He further testified his understanding was "[t]hat Dr. Dalsey was paid the licensing fee for putting the business together" which "started from day one," but he was not aware of a formal vote or a written agreement memorializing the fee. Dr. Barrett said he did not think taking a $50,000 yearly management fee at ONS violated Dr. Dalsey's duty of loyalty, because he was the only member that "did any of the administrative work at the practice ever."

Dr. Barrett testified that after the failed brewery venture, it seemed that plaintiff's "goal was to take [Dr.] Dalsey down." He said plaintiff "would fly off the handle with staff if they put too [many] people on the schedule, kicking cabinets, breaking computers, stealing Dictaphones with people's office notes on them, . . . [and] sequestering these same Dictaphones so no one could use them." He conceded there were incidents between employees and Dr. Dalsey that caused the employees to be upset and leave the practices.

Plaintiff's forensic economist, Chad Lawrence Staller, JD, MBA, MAC, CVA, testified regarding the "calculation of economic damages" presented in his reports. The expert relied on the July 7, 2011 ONS letter agreement and determined that plaintiff was entitled to exit pay of $697,497 from ONS under the agreement's formula. He cited to Sections 9, 11, and 11.3 of SSF's OA in concluding SSF owed plaintiff $203,521. The same methodology was applied to determine plaintiff was owed $42,090 for 2020 income and liquidated damages of $84,180.

Staller opined plaintiff was owed $160,152 for his share of management fees based on his ownership interest in SSF and the payments made to Dr. Dalsey. The expert testified plaintiff was entitled to $180,502 for his work at Salem.

21

Staller challenged defendants' accountant's conclusions, stating there was no source material or supporting documents for the methodology used for the calculations, the calculations were "ad-hoc," the finding that plaintiff owed ONS $255,974 was contradicted by Dr. Dalsey's deposition testimony that ONS' entire debt was $148,000, and the conclusion that plaintiff owed SSF $652,000 did not follow the formula set out in SSF's OA to calculate financial obligations.

Steven M. Swartz, CPA, PFS, CVA, defendants' expert accountant, testified regarding his calculations of economic losses. He stated he had been ONS's accountant since approximately 2000 and SSF's accountant since about 2009. At one point he was a partner in the real estate entity that owned the building in which ONS was a tenant and is the accountant for the brewery.

Swartz testified he used a cash flow methodology to arrive at his damage figures, meaning:

> [F]rom the historical records, we measured cash in, right, how much comes in, in the form of revenues or grants or ancillary-service income, and then we measured expenses or costs going out and netted the two of those in order to arrive—after attributing credit to each partner on a percentage basis—pro rata percentage basis and measuring dates of service, so for [plaintiff], who had, for example, at ONS, the date was December 19th of 2019, he was given credit for dates of service for revenues from physician services for dates of service prior to that date.

22

> Then we net that against the expenses going out to come at a net operating income or deficit on a cash-flow basis.

The expert supported his methodology from speaking with Dr. Dalsey, an office manager, and his personal opinions and understandings. He concluded plaintiff owed SSF $618,322.

Swartz discussed his criticisms of Staller's calculations. He stated Staller did not reduce the ONS accounts receivables by the insurance adjustments and other allowances, he did not consider financial information from 2018 when determining 2019 income, and the receivables were overstated.

Dr. Dalsey testified that the ONS letter agreement was a binding agreement on the members, however he also thought the 2017 OA signed only by Dr. Bodin was binding on the other ONS members as a verbal agreement. He disagreed that the intent of Section 10.2 in the 2017 OA was for all members to work on a regular basis.

When asked about the emails referencing and attaching the Blank Rome document concerning plaintiff's potential departure, Dr. Dalsey responded that he never opened emails. He said he saw the Blank Rome document at the same time as the other partners at the meeting. When asked about the Blank Rome memorandum, he stated that Dr. Bodin expressed concerns about plaintiff's

23

potential departure. Dr. Dalsey testified he instructed Rappaport to remove plaintiff's name from the second draft and information as to how a member could leave the practice.

Dr. Dalsey testified he considered the monthly $10,000 payment he received from SSF a licensing fee, not a management fee or salary. He agreed the fee was not related to his status as the managing member. He conceded there was no written agreement entitling him to the payment.

Dr. Dalsey also testified regarding outstanding financial obligations for ONS including his "personal" $50,000, for the work he did for ONS after the business closed. He stated he was the primary contact for the practice's accountants. Dr. Dalsey conceded he cancelled Dr. Bodin's and plaintiff's malpractice insurance.

Dr. Bodin also testified at the hearing. He stated that several months before he expected to become a member of ONS, he became concerned with plaintiff's expressed dissatisfaction with the partnership, and the "conflict" between plaintiff and Dr. Dalsey. Dr. Bodin stated he and Dr. Dalsey discussed reviewing and modifying the practices' OAs to hold minority members "accountable," and Dr. Dalsey said the practice would pay for Blank Rome to review the OAs.

According to Dr. Bodin, during the conversations, Dr. Dalsey expressed that plaintiff had to leave the practices. Dr. Dalsey was aware he could not take any action against an active member without legal proceedings, but he told Dr. Bodin to ask counsel about the situation when they reviewed the practices' OAs.

Dr. Bodin said he sent the Blank Rome memo to Dr. Dalsey in an email and discussed it with him. Dr. Bodin testified that Dr. Dalsey instructed Rappaport to redact from the memo any references to plaintiff before it was given to the members. Dr. Bodin was unaware until the arbitration hearing that Rappaport had sent plaintiff an unredacted copy as well. Dr. Bodin said no changes were ever made to the ONS or SSF OAs while he worked at the practices.

Dr. Bodin testified his negotiations to become a member were "contentious" and he began to feel differently about Dr. Dalsey and the practices' accounting procedures. When asked about plaintiff, Dr. Bodin said when he was a new associate, he perceived plaintiff as "an obstructionist and . . . a complainer," but that once he became a full member, he began to share plaintiff's dissatisfaction with Dr. Dalsey and the inequities in the accounting of the practices and realized that plaintiff "was actually quite right." Dr. Bodin

testified that when he announced his intention to withdraw, he was told he could not do so, and he had a debt obligation.

During Dr. Levy's testimony, he stated the July 7, 2011 ONS OA and letter agreement did not govern the operation of ONS, because they were created in order to procure a loan. When asked what document governs departing members, he responded he "ha[dn't] thought about that." He testified he signed an OA for ONS when he was first hired and that was the controlling document, but he could not produce the document and did not recall the rights and responsibilities it delineated to departing members. Dr. Levy further testified that he was not bound by the ONS OA he had signed but he was bound by the OA document that was only signed by Dr. Bodin.

Dr. Levy testified it was his position that Dr. Bodin could not leave ONS until he paid back monies from uneven draws and debts he was responsible for. Dr. Levy did not know where there was support in the applicable ONS or SSF agreement for his position.

### B.

On August 22, 2022, the arbitrator issued an award finding ONS, SSF, and Dr. Dalsey had breached their respective OAs and duties of good faith and fair dealing. The arbitrator granted awards of $397,231.50 jointly and severally

26

against ONS and Dr. Dalsey, and $241,611 jointly and severally against SSF and Dr. Dalsey. The arbitrator found plaintiff proved his claim of unjust enrichment against Dr. Dalsey from his receipt of revenue from Salem without providing any services and awarded plaintiff $105,359.31.

In a comprehensive, well-reasoned forty-five-page written opinion, the arbitrator found that plaintiff was a "significantly less sophisticated" businessman compared to Dr. Dalsey, who was "a very sophisticated and controlling business partner."

The arbitrator found that Drs. Dalsey, Barrett, Levy, and plaintiff signed the July 7, 2011, ONS letter agreement which "address[ed] a departing member's equity distribution." The arbitrator found the agreement was "unambiguous and the members intended to be bound by its terms." The arbitrator stated that "there was no subsequent change or amendment to the [l]etter [a]greement." Therefore, it controlled the equity distribution of departing ONS members. The arbitrator noted all the ONS members received the modified Blank Rome document in 2015 and therefore "Drs. Dalsey, Barrett and Levy were on notice of the Blank Rome opinion that the [l]etter [a]greement . . . controlled the equity distribution of departing ONS members."

In considering the $10,000 monthly fee paid by SSF to Dr. Dalsey, the arbitrator found "it was a payment in recognition of Dr. Dalsey's proprietary concept of an emergency orthopedic office practice" and "for his implementation and negotiation of the third[-]party contracts, which made the practice successful." The arbitrator noted the SSF members never "chang[ed] the original agreement to pay Dr. Dalsey the monthly recognition fee." The arbitrator concluded "that Dr. Dalsey's receipt of the $10,000 proprietary fee did not give rise to a claim of unjust enrichment."

In turning to the breach of contract issues, the arbitrator found Dr. Bodin's testimony was more credible than that of Dr. Dalsey regarding "Dr. Dalsey's involvement with the Blank Rome memorandum." The arbitrator stated that "Dr. Dalsey was the controlling person" behind it and "used the recruitment of Dr. Bodin and the Blank Rome memorandum as an opportunity to assess whether or not [plaintiff] could be expelled from the practice at that time."

> I find that Dr. Dalsey knew that the ONS and SSF operating agreements were poorly drafted and presented an economic danger to the practices if several physicians decided to leave the practices at the same time. I find that as the financial well-being of ONS and SSF began to deteriorate in December of 2018, Dr. Dalsey devised a strategy to keep physicians in the practices, or exit them as inexpensively as possible. . .
> I find that Dr. Dalsey, as managing member, with the concurrence of Drs. Barrett and Levy, then began a

negotiation with Dr. Bodin arguing the cash flow debt obligation strategy that Dr. Da1sey originated with the assistance of . . . Swartz to avoid paying Dr. Bodin his member departure equity as provided for in the [l]etter [a]greement dated July 7, 2011 . . . .

The arbitrator found plaintiff had the right to withdraw from ONS in 2019 and that Dr. Dalsey breached his duty of good faith and fair dealing by obstructing plaintiff's exit "for the purpose of implementing the same cash flow debt obligations strategy to negotiate a more favorable departure price for [plaintiff's] equity interest." The arbitrator also found Dr. Dalsey "breached the ONS [OA] . . . by failing to provide [plaintiff] the relevant information necessary to determine his 25% share of money, owned assets[,] and outstanding receivables, and to pay out [plaintiff's] ONS equity interest based upon the terms of the [l]etter [a]greement."

Regarding the SSF OA, the arbitrator found Dr. Dalsey failed to provide SSF's financial records until the arbitrator ordered disclosure; Drs. Dalsey, Barrett, and Levy intended "to use the cash flow debt obligation strategy with Section 9.2 . . . to negotiate a discounted buy out"; Section 9.2 is void and unenforceable; plaintiff's dissociation from SSF was not a breach of Section 9.2 and was not gross negligence or willful misconduct. The arbitrator concluded that Drs. Dalsey, Barrett, and Levy breached SSF's OA by failing to provide

plaintiff with financial records and for "adopting the cash flow debt obligation strategy" and not compensating plaintiff for his equity interest according to Section 11.3.

In addressing plaintiff's claim that he was an oppressed minority member, the arbitrator found plaintiff's "actionable claims are principally contractual in nature" and "that the evidence in the record does not support a claim of fraud or minority member oppression by Dr. Dalsey."

Regarding the expert testimony, the arbitrator found "Staller's methodology to calculate ONS's [e]xit [p]ay by relying upon the language of paragraph 4 of the [l]etter [a]greement . . . [was] consistent with the members' contractual agreement." The arbitrator found "that the recalculated ONS [e]xit [p]ay of $349,721.50 is reasonable and consistent with the written agreement of the members."

In considering plaintiff's claim of lost income in 2019, the arbitrator noted plaintiff was paid less than Drs. Dalsey, Barrett, and Levy that year. The arbitrator found "Staller's reliance upon income reported on federal tax returns for Drs. Dalsey, Barrett, Levy and [plaintiff] . . . [is] credible and compelling." The arbitrator stated that Staller's calculation of $47,511 as owed to plaintiff for

the 2019 income shortfall was supported by the record. The arbitrator explained his reasons for rejecting Swartz's calculations.

The arbitrator turned to plaintiff's claims under the SSF OA agreement, noting the parties disputed whether Article IX, Section 9.2 Withdrawals or Article XI Divestiture of Interest controlled plaintiff's departure. Defendants contended Article IX controlled, and plaintiff could not leave SSF without the approval of the membership. Because plaintiff did not have that approval, he was in default of the OA when he left the practice and consequently owed the remaining members damages delineated under Section 13.3(ii).

The arbitrator concluded Section 9.2 violated public policy and was the product of economic oppression. Because a member could never leave the practice without the majority members' approval, the arbitrator found the provision "create[d] an involuntary servitude" in contravention of public policy. The arbitrator also relied on the RULLCA, which "grants members of a limited liability company significant power to dissociate, which cannot be frustrated by an unenforceable agreement, which violates public policy and the law." (citing N.J.S.A. 42:2C-45(a) and -46(a)). The arbitrator determined Article XI Divestiture of Interest was the appropriate section of the SSF OA under which to calculate plaintiff's exit pay.

The arbitrator agreed with Staller's analysis regarding the pay due plaintiff from SSF, finding plaintiff was owed exit pay of his "capital account of $50,000.00, plus his share of receivables through March 15, 2021, of $149,521.00 in the total amount of $199,521.00." The arbitrator also concurred with Staller's estimate of a 2020 income shortfall of $42,090.00.

In contrast, the arbitrator found

> Swartz allowed Dr. Dalsey and [the ONS/SSF office manager] to influence his decision to pursue a cash flow debt obligation strategy. I also find that . . . Swartz admitted that there is no agreement among the members, industry standard[,] or treatise supporting the cash flow debt obligation methodology which would place liability on [plaintiff] for ONS and SSF debt obligations. I find that there is no basis to impose individual liability for ONS and SSF's debt obligations upon [plaintiff] or any other member.
>
> [(citation omitted).]

In considering plaintiff's claim of a violation of the Wage Theft Act, the arbitrator found plaintiff did not offer any evidence of an employment agreement with either practice. He found Section 8.4 of the SSF OA specifically pertains to members, and that plaintiff was not an employee of ONS or SSF. Swartz testified the practices were "treated as partnerships for [s]tate and [f]ederal tax purposes, and the members were treated as . . . partners[,] not employees." As

32

a partner, plaintiff did not receive W-2 wages. Therefore, plaintiff could not sustain a Wage Theft claim.

Plaintiff also asserted an unjust enrichment claim against Dr. Dalsey, alleging he took a full member's share of the income ONS received from Salem but did not take any shifts or cover weekends or holidays. The arbitrator found "that Dr. Dalsey did receive an unjust enrichment in that he used his position as managing member to exempt himself from any work at Salem." However, the arbitrator modified Staller's calculated amount of damages because "Dr. Dalsey provided valuable services in initiating and maintaining the contractual relations with Salem." The arbitrator awarded plaintiff $105,359.31 for unjust enrichment. The total economic damages awarded equaled $744,202.81.

In turning to defendants' counterclaims, the arbitrator found defendants had not provided evidence to support their assertions. To the contrary, Dr. Barrett admitted certain allegations were baseless and inappropriate. The arbitrator found Dr. Dalsey's testimony regarding plaintiff's actions was not credible and rebutted by other evidence.

The arbitrator denied plaintiff's claim for attorney's fees and costs as the parties' agreements did not provide for an award, and he dismissed plaintiff's wage theft and minority member oppression claims.

Thereafter, defendants requested the arbitrator correct some of the calculations in the award. The arbitrator denied the request, stating that defendants "raise[d] various substantive arguments concerning the damage award," such as "double dipping, incorrect number of partners, failure to consider overhead costs, and failure to net out of the award on[-]call money." The arbitrator found these were arguments that were either already considered during the hearing or were being raised for the first time.

## II.

In October 2022, plaintiff filed a motion for an order to show cause summary action with the Superior Court, along with a verified complaint. The complaint alleged that defendants acted in bad faith by refusing to pay the arbitration award and for submitting meritless legal arguments to the arbitrator, refusing to discuss or acknowledge the arbitration award, and failing to confirm the funds held in escrow. Plaintiff sought conversion of the arbitration award into a judgment against each defendant, an order compelling defendants to confirm and turn over the monies held in escrow, interest, and for attorney's fees and court costs.

After the trial court granted the motion for an order to show cause, defendants filed a verified complaint summary action seeking to vacate or

modify the arbitration award. The court granted defendants' motion and consolidated the two summary actions. The court also permitted Drs. Barrett and Levy to join the actions as the two remaining members of SSF.

In defendants' answer, they asserted the arbitration award should be vacated "because the arbitrator vastly exceeded the scope of his authority" and conducted the hearing with a lack of impartiality and contrary to the New Jersey Arbitration Act.

After hearing oral arguments, Judge Daniel A. Bernadin issued an order on March 13, 2022, confirming the arbitration award, entering judgment in accordance with the award, releasing $200,000 held by defendants in escrow, and awarding plaintiff $27,577.50 in attorney's fees and costs incurred in the enforcement of the award.[2]

In an accompanying written opinion, Judge Bernardin found the parties intended "to submit all claims and counterclaims related to the . . . practices to binding arbitration, without limitation," and that the arbitrator's determinations were "well within the scope of the parties' agreement to arbitrate." The court specifically found the arbitrator's decision to strike Section 9.2 "in the SSF [OA]

---

[2] An amended order was issued March 22, 2023 without any substantive changes pertinent to this appeal.

as violative of public policy was . . . grounded in law as applied to the facts found by the arbitrator"; the finding that Dr. Dalsey violated the duty of good faith and fair dealing was "amply supported" because "Dr. Dalsey commissioned the Blank Rome memo and altered it to remove references" to plaintiff's removal before distributing the memorandum to the other members; the arbitrator's finding that Dr. Dalsey was unjustly enriched was supported by the fact that he continued to receive 25% of the profits despite not working on weekends or holidays and refusing to work at Salem; the arbitrator's decision to sequester witnesses was within his discretion; the arbitrator's reliance on case law and statutes not submitted by the parties was proper because there were no limits placed on the scope or authority and the arbitrator "was free to interpret New Jersey law and apply [it] to the fact[s] as he found them"; "[t]he decision to preclude testimony from Dr. Dalsey rebutting [plaintiff's] economic expert's opinion was proper" because "Dr. Dalsey had ample time to provide his fact testimony and [defendants] presented an economic expert"; "the determination of joint and several liability between [defendants] was within the" arbitrator's authority; and his review of the record established the arbitrator "fairly interpreted and complied with the AHLA Rules and the New Jersey Arbitration Act" and did not evidence partiality or misconduct against any party.

III.

On appeal, defendants contend the court erred in finding the arbitrator did not exceed his authority in finding the SSF OA was against public policy and in finding joint liability against Dr. Dalsey because plaintiff did not submit those claims in arbitration. Defendants also assert the court erred in finding the arbitrator was impartial.

We review a decision "to vacate an arbitration award de novo." Yarborough v. State Operated Sch. Dist. of Newark, 455 N.J. Super. 136, 139 (App. Div. 2018). However, we are mindful of New Jersey's "'"strong preference for judicial confirmation of arbitration awards."'" Middletown Twp. PBA Loc. 124 v. Twp. of Middletown, 193 N.J. 1, 10 (2007) (quoting N.J. Tpk. Auth. v. Loc. 196, I.F.P.T.E., 190 N.J. 283, 292 (2007)).

"An arbitrator's award is not to be cast aside lightly. It is subject to being vacated only when it has been shown that a statutory basis justifies that action." Bound Brook Bd. of Educ. v. Ciripompa, 228 N.J. 4, 11 (2017) (quoting Kearny PBA Loc. # 21 v. Town of Kearny, 81 N.J. 208, 221 (1979)).

N.J.S.A. 2A:24-8 provides that a court "shall vacate" an arbitration award:

> a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

We begin with considering whether the arbitrator exceeded his scope of authority. "The scope of the arbitration is dependent solely on the provisions and conditions mutually agreed upon in the parties' agreement." Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 556 (2015). "If the arbitrators decide a matter not even submitted to them, that matter can be excluded from the award." In re Arb. Between: Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc., 135 N.J. 349, 358 (1994) (quoting Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 548 (1992) (Wilentz, C.J., concurring)).

When addressing N.J.S.A. 2A:24-8(d), we have stated:

The "exceeds their powers" test of N.J.S.A. 2A:24-8(d) has consistently been construed to require the reviewing court to determine whether the interpretation of the contractual language contended for by the parties seeking arbitration is reasonably debatable in the minds

of ordinary laymen. If a debatable question exists, the reviewing court is bound by the arbitrators' decision.

[Selected Risks Ins. Co. v. Allstate Ins. Co., 179 N.J. Super. 444, 451 (App. Div. 1981)].

In addition, our Supreme Court has determined that in the absence of a limiting contractual provision, an "arbitrator ha[s] broad discretion to fashion the appropriate remedy." Sanjuan v. Sch. Dist. of W. N.Y., 256 N.J. 369, 384 (2024).

We see no reason to disturb Judge Bernardin's conclusion that the arbitrator did not exceed the scope of his authority in issuing the award. The parties agreed in the July 31, 2020 arbitration order that "all claims among the parties arising from their business relationship involving [ONS] and [Dr. Dalsey] should be submitted to arbitration under the arbitration provisions, set forth in the operating agreement of [SSF]." Under Section 14.1 in the SSF OA, the parties agreed that "any issue, controversy, claim or dispute which shall arise with regard to the performance or interpretation of any section of this Agreement" would "be submitted to binding arbitration[] before a single arbitrator through AHLA." The arbitrator correctly considered all of the parties' claims arising out of their business relationship.

We similarly are unpersuaded by defendants' contention that the judge erred in finding the arbitrator did not exceed his authority in striking Section 9.2 of the SSF OA for violating public policy. Plaintiff's claims of breach of contract for payments owed to him and his challenge of defendants' refusal to permit him to withdraw from the practices were directly related to the interpretation and enforceability of Section 9.2.

"A basic tenet of contract interpretation is that contract terms should be given their plain and ordinary meaning." Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 321 (2019). "Contracts should be read 'as a whole in a fair and common[-]sense manner.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Hardy by Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)). However, "contract principles authorize courts to invalidate contracts that contain terms that are unconscionable and in violation of public policy." Skuse v. Pfizer, Inc., 244 N.J. 30, 64 (2020).

Judge Bernardin considered the arbitrator's conclusion that Section 9.2 violated New Jersey's public policy and N.J.S.A. 42:2C-45(a) and -46(a) of the RULLCA. Under N.J.S.A. 42:2C-45(a), "A person has the power to dissociate as a member at any time, rightfully or wrongfully, by withdrawing as a member

by express will under section 46 of this act." (footnote omitted). N.J.S.A. 42:2C-46 provides,

> A person is dissociated as a member from a limited liability company when:
>
> > a. The company has notice of the person's express will to withdraw as a member, but, if the person specified a withdrawal date later than the date the company had notice, on that later date . . . .

As Judge Bernardin stated, the arbitrator's determinations regarding Section 9.2 were supported by the evidence in the record and the applicable law.

Defendants also challenge the award of joint liability against Dr. Dalsey, stating he did not have notice of the claim because it was raised in post-hearing submissions, depriving him of the opportunity to refute it. Judge Bernardin properly rejected this contention. As stated, plaintiff expressly included claims against Dr. Dalsey in his individual capacity in the Notice of Arbitration filed in May 2020, approximately two years before the arbitration hearing began.

The arbitrator considered N.J.S.A. 42:2C-39, which delineates the duties of loyalty and care owed by members of an LLC to one another and to the LLC. The arbitrator found that Dr. Dalsey, in his capacity as a managing member, told plaintiff he was not approved to leave the practices, did not provide plaintiff with financial records and information upon request, and stopped payments to

41

members without explanation and without any expressed plan to address the financial situation. Dr. Dalsey also fabricated the theory that plaintiff could not leave the practices because he had a debt obligation.

After reviewing the arbitrator's decision, Judge Bernardin stated:

> Considering the arbitrator's finding of misconduct and the violations of the statutory duty of good faith and fair dealing by Dr. Dalsey as Managing Member, the determination of joint and several liability between ONS, SSF and [Dr.] Dalsey was within the authority of the arbitrator to impose. [Plaintiff's] assertions against Dr. Dalsey individually were clearly stated, within the scope of the parties' business disputes, and properly adjudicated.

We discern no reason to disturb Judge Bernardin's conclusion on this issue.

We have reviewed and found meritless defendants' remaining arguments. The record reflects the arbitrator carefully conducted this extensive hearing with accommodations and leeway given to all parties regarding their presentations. Judge Bernardin found the arbitrator's determinations were well reasoned and supported by the evidence in the record and the applicable principles of law. Defendants have prevented no valid grounds upon which the award may be vacated.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

42